### GALVESTON ELECTRIC CO. v. SWANK.*
#### (No. 7207.)

(Court of Civil Appeals of Texas. Galveston. June 22, 1916. Rehearing Denied Oct. 5, 1916.)

1. STREET RAILROADS ⚖⇒73—"FENDERS."

Galveston ordinance, making it unlawful to operate cars without lifeguard or fender on the front end, merely requires an effective contrivance to prevent persons from being run over, and it need not project in front of the car.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 153; Dec. Dig. ⚖⇒73.]

2. TRIAL ⚖⇒252(9)—INSTRUCTIONS—APPLICATION TO EVIDENCE.

Evidence held not to warrant charge to find for the injured pedestrian if the car had no fender, since it tended to show that there was a fender, and such charge was therefore prejudicial.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 603; Dec. Dig. ⚖⇒252(9).]

3. STREET RAILROADS ⚖⇒103(2)—INJURIES TO PEDESTRIANS—DISCOVERED PERIL.

A street railway company is not liable if the injured pedestrian has negligently placed himself in danger, if the peril could have been discovered by the exercise of ordinary care, but only if, after actually discovering it, the opera-

tives failed to use all means at their command to prevent injury to the pedestrian.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 219; Dec. Dig. ☞103(2).]

Appeal from District Court, Galveston County; Clay S. Briggs, Judge.

Action by Elizabeth Swank against the Galveston Electric Company. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Terry, Cavin & Mills, of Galveston, for appellant. Marsene Johnson, Elmo Johnson, and Roy Johnson, all of Galveston, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against appellant to recover damages for personal injuries to appellee, alleged to have been caused by the negligence of appellant and its employés. The petition alleges, in substance, that while crossing appellant's street car track at a public street crossing in the city of Galveston, appellee was struck and injured by one of appellant's cars, which was being operated on said track by employés of appellant. The grounds of negligence relied upon for recovery of damages was the running of the car at a dangerous rate of speed, the failure to keep a proper lookout to discover plaintiff on said crossing, the failure to use proper care to prevent the injury to plaintiff after her peril was discovered, "or could have been discovered by said operatives by the use of due care," and the failure to provide a life guard or fender "on the front end of the car," as required by an ordinance of the city of Galveston. The defendant denied each of the allegations of negligence charged in the petition, and pleaded that plaintiff was guilty of contributory negligence in going upon defendant's track without looking or listening for the car, and such negligence of plaintiff was the proximate cause of her injury. The trial in the court below with a jury resulted in a verdict and judgment in favor of plaintiff for the sum of $2,000.

The first assignment of error complains of a paragraph in the court's charge which instructs the jury to return a verdict for the plaintiff if they find from the evidence that the car which struck plaintiff "was not at such time and place equipped or provided with a life guard or fender on the front end of such car," because there is no evidence showing, or tending to show, that the car was not at said time and place equipped or provided with a life guard on its front end. The ordinance which appellant is charged to have violated is as follows:

"That it shall be unlawful for any person to operate a street car within the limits of the city of Galveston unless such car shall be provided with a life guard or fender on the front end of such car and for each violation thereof the offender shall be fined the sum of ten dollars."

188 S.W.—45

The testimony of plaintiff's witnesses was to the effect that there was no fender upon the front end of the car. In regard to what these witnesses considered a fender, one of them said:

"I don't know what a fender is; I suppose it is some kind of protection in the front of the car to protect from running over people; it is like a cowcatcher of a locomotive, something on that order. I did not go around to examine the front end of that car."

The other stated:

"A fender is a kind of a basket of steel attached to the front of the car. There are a great many different kinds of fenders. I never paid any particular attention to the latticework arrangement, kind of slats, that come down in front of the Galveston Electric Company cars; I cannot say that there was one of those latticework fenders on that car or that there was not. I did not make any examination of the car. This car did not have a dip net or scoop, or anything like that in the front end of it."

All of the testimony shows that there was no fender on the car of the kind described by plaintiff's witnesses.

George Ritzler, motorman of the car, testified as follows:

"I saw the lady as she lay under the car. I did not get off the car. I saw her after the conductor and the men pulled her off to the side. They took her from the west side of the car, right by that fender. There was a fender on the car. The fender consists of latticework, like latticework. That fender works with a trigger in front of the car. When it runs against anything, that trips the fender underneath, and that puts the person on the fender. There was one of those on this car; there was a fender on the car.

"This instrument, that I called a while ago a fender, is about 8 feet from the wheels—from the front end of the car. There is nothing on the front end of the car like that they have in Houston and New Orleans; it is a fender underneath the car, 8 feet from the front. That was true as to my car that day. I have never operated a street car in Houston, and I have never observed the operation of cars in other cities. I have never been to El Paso. I have heard of their taking one of those fenders and picking up a little dog with it.

"It is not a fact that that old lady was pulled right out from underneath the running board by the side of the car; she was on the front end. Her foot was nearly touching the fender. Her head was outside and her feet was nearly on the fender. Her head was to the west, and her feet was on the inside of the fender. That is true, I know it. She wasn't dragged over 5 feet. I think she was barely touched, because her heel was right against the fender, and her head was out in the street."

"There was a negro school over there. Her head was out toward the Rosary School, and her feet up against the fender."

M. B. Osborn, appellant's master mechanic, testified as follows:

"There is a fender on the car. In the first, right under the front end of the car, is a gate or trigger that when that gate is struck that it trips the pick-up in front of the wheels, about 8 feet from the front end of the car. I would roughly state that the fender itself is about 24 or 30 inches ahead of the wheels, and any object that comes under that guard will be picked up by this fender automatically; it takes about 14 pounds pressure to trip that gate, and that trips your pick-up. My inspection of the car was made early the next morning after the accident at

706 SOUTHWESTERN REPORTER (Tex.

night. I found the fender there at that time in good working order, and tested it with a pair of scales to be sure. I could not say how many different kinds of fenders there are in use in street cars generally throughout the country, but there must be a dozen or 15 different kinds. There are some types of fenders that extend out in front, and there are some that go underneath, and I have only found one that will do anything like it is claimed to do; that is the H. B. lifeguard, which is our standard, the only one we use. There is objection from the standpoint of a street car to a fender that extends out in front of the car; one thing is, in turning curves it overhangs, and it is liable to strike something clear of the track, and also possibly cause accidents that if it didn't project you may not have that trouble. The general purpose of a fender is to keep from running over anybody that is struck by the car. Of course, the main part is to keep the wheels from running over them and cutting the body in two. I have been in New Orleans, but I could not·say about thousands of street cars there passing up and down Canal street, I could not say that all of them have fenders sticking out in front that scrape along the·track and picks you up and throws you in a basket; I have not seen it happen. I have seen the fenders, but not particularly in New Orleans. We had a fender of this kind on car No. 159, right under the front end of the car, and there is a pick-up on the front end of the car. There is no fender on the front end of the car."

"Q. Now, take this old lady, if she crumpled up she would go 8 feet under the car before she would get to the wheels and the fender? A. She would probably be 8 feet from the front of the car before she would be picked up."

"I could not say if a fender in front would pick her up and throw her in a basket; I have not had any experience. I was out there; I did not see the old lady. I do not know that the state law compels us to put a fender on the front end of the car. We have the same type of fender here that they have in Houston. I have been in Houston lately. I do not think they were in existence at the time this old lady was hurt last year. The front end of the car No. 159 is level with the car, extends out; there is no platform along there before you get to the trucks; there is an extension and a floor. It is about 26 inches from the top of the rail to the bottom of the platform. I am not about 40 inches thick like you (Mr. Marsene Johnson). I am about 14 inches thick. If the front end of that car were to hit you or me, it would not roll us up like a ball; there is room enough for a body to go under clear. I would imagine it pretty close to death. Big men like you and me would have more show than a rabbit; it would be a matter nearly impossible to kill a man. I don't think we have killed a person since these fenders were installed, and they were completed in the spring of 1912. I don't think we killed a person in Galveston since then by running over them. We have hit a good many people and picked them up in every case. The fender they have on the Galveston Electric Company cars is the only one that I have had experience with. From a mechanical standpoint that is nearer perfection than any other fender that I ever investigated and tried. It is very nearly impossible for a body to pass under this car with the fender down. The fender goes down, works automatically by a gate that goes down when it is struck. That gate is right near the front end of the car. There is no fender which will prevent a person being struck by a car. The thing that a fender is supposed to prevent is to keep a body that is struck by the car from being run over by the wheels and cut to pieces."

[1, 2] We think upon this state of the evidence the trial court erred in giving this charge. According to the testimony a "fender" and a "life guard" are synonymous terms, and the undisputed evidence shows that there was a fender, or life guard, on the front end of the car, which the only witness who testified as to the merits of different kinds of fenders stated was the best that could be used. The charge must have been given upon the theory that it was for the jury to say whether the fender which was shown to have been on the car was the kind of fender contemplated by the ordinance before set out, and the jury must have so understood it. The ordinance does not describe the kind of fender or life guard which appellant was required to place upon its cars. The requirement that it must be on the front end of the car cannot be construed to mean that it must project in front of the car. It is apparent, as stated by the witness Osborn, that the primary purpose of a fender, or life guard, is to prevent a person, when struck by a car, from getting under the car wheels, and a fender or life guard which is placed in front of the front wheels of the car is on the front end of the car, and one so placed, which is of approved type and effectively accomplishes the purpose for which it is intended, must be regarded as fulfilling the requirements of the ordinance. We think no other reasonable construction can be placed upon the ordinance.

The testimony upon the other issues of negligence submitted to the jury was sharply conflicting, and therefore the error of court in giving the charge complained of was highly prejudicial to appellant, and was reasonably calculated to cause, and probably did cause, the rendition of an improper judgment.

[3] The court further erred in the charge submitting the issue of discovered peril, in that the jury was instructed that they might find for the plaintiff upon this issue if they believed from—

"the evidence that the motorman of said street car discovered the peril, or in the exercise of ordinary care could have discovered the peril of the plaintiff, in time to have stopped said car and avoided such collision, and that said motorman so failed to stop said car, and if you believe from the evidence that such failure, if any, constitutes negligence on the part of the defendant."

It is the settled rule of decisions in this state that the duty which devolves upon the operatives of cars or other vehicles by which others may be injured, to use all the means at their command to prevent injury to one who has negligently placed himself in the way of the car or vehicle, is not called into exercise until such person's peril is actually discovered. In the case of Railway Co. v. Breadow, 90 Tex. 26, 36 S. W. 410, the principle upon which the doctrine of discovered peril rests, and the rule for the application of the doctrine, are thus stated:

"This new duty and liability for its breach is imposed, upon principles of humanity and public policy, to prevent what would otherwise be, as far as civil liability is concerned, the licensed destruction of persons negligently exposing them-

selves to peril. The same principle of law which, on grounds of public policy, will not permit a person to recover when his own negligence has proximately contributed to the injury, will not permit the party who has inflicted the injury in violation of such new duty to defend upon the ground of such negligence. The principle, however, has no application in the absence of actual knowledge, on the part of the person inflicting the injury, of the peril of the party injured, in time to avoid the injury by the use of the means and agencies then at hand. If he had no such knowledge, the new duty was not imposed, though it be clear that by the exercise of reasonable care he might have acquired same."

The case of San Antonio Traction Co. v. Kelleher, 48 Tex. Civ. App. 421, 107 S. W. 66, clearly and forcibly restates the rule, and cites a number of the authorities by which it has been approved and followed.

If any error is pointed out by the other assignments of error presented in appellant's brief it is not such as is likely to occur upon another trial, and therefore said assignments need not be discussed.

For the errors in the charge before pointed out the judgment of the court below is reversed, and the cause remanded.

Reversed and remanded.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.